IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADDELYN L., by and through her | : | |
| parents, STEVAN L. and AIMEE L., | : | |
| both of Downingtown, Pa. 19335 | : | |
| | : | |
|     and | : | |
| | : | |
| STEVAN L. and AIMEE L., individually, | : | |
| and on their own behalf | : | Civil Action |
|     Plaintiffs | : | |
| | : | |
|     v. | : | No. |
| | : | |
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | |
| 540 Trestle Place | : | |
| Downingtown, Pa. 19335 | : | |
|     Defendant | : | |

## **COMPLAINT**

### I.    **Introduction**

1.    This action is brought by Addelyn L. ("Addelyn"), a minor child with disabilities, by and through her parents, Aimee and Stevan L., and Aimee and Stevan L. individually, ("Parents," and together with Addelyn, the "Plaintiffs" or the "Family"), against Defendant Downingtown Area School District (the "District").

2.    Addelyn is a 17-year-old with disabilities including Specific Learning Disabilities in reading comprehension and listening comprehension, Speech or Language Impairment, and Attention Deficit Hyperactivity Disorder ("ADHD").

3.    Addelyn is a diligent student who relies on the special education and related services in her Individualized Education Programs ("IEPs") to be successful and who strenuously advocated to her IEP team that she continues to need those services.

4.    Despite stagnant or even declining standardized scores and inconsistent progress

monitoring, the District attempted to remove Addelyn's IEP over her and her parents' objections, leading to an administrative due process hearing.

5.    The administrative due process Hearing Officer determined that Addelyn continues to need an IEP to provide Specially Designed Instruction, but he failed to award any compensatory education for the years in which that instruction was not appropriately provided and Addelyn was denied a Free Appropriate Public Education ("FAPE") under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and the Individuals with Disabilities Education Act ("IDEA").

6.    The Family's claims are brought under the IDEA, 20 U.S.C. § 1400, *et seq.*, and its federal and state implementing regulations; Section 504, 29 U.S.C. § 794, and its federal and state implementing regulations; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

7.    After fully and independently considering the entire record and the failures of the District to provide Addelyn with a FAPE, this Court should determine that the District violated the foregoing statutes and: (1) affirm the Hearing Officer's decision that Addelyn continues to require an IEP; (2) conduct a trial de novo on the District's failure to provide FAPE under Section 504; (3) award compensatory education under Section 504 and IDEA based on the District's failures to offer and provide a FAPE to Addelyn from March 28, 2023 through the date of this Court's adjudication of this claim; (4) award reasonable attorney's fees and costs to the Family as a prevailing party; and (5) award any other relief this Court deems just.

## II.    Parties

8.    Addelyn was born in 2008. She was and is at all relevant times a resident of the Defendant Downingtown Area School District. Addelyn is a student with disabilities as defined

under IDEA and a Protected Handicapped Student under Section 504 and the ADA.

9.    Stevan L. and Aimee L. are Addelyn's parents with whom Addelyn resides within the geographic boundaries of the District.

10.    The District is located at 540 Trestle Place, Downingtown, Pennsylvania 19335. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA, Section 504, and the ADA. *See* 22 Pa. Code Chapters 14 and 15; *see also* 24 P.S. Chapter 13; 11 P.S. § 875-101.

**III.    Procedural History**

11.    On March 28, 2025, Addelyn's Parents, on her behalf, filed a Special Education Due Process Complaint.

12.    Addelyn's Parents presented evidence in support of her claims during the due process hearing sessions held in person on July 1, 2025, July 2, 2025, July 22, 2025, and August 13, 2025.

13.    On August 21, 2025, the administrative Hearing Officer issued a Decision holding that: (1) the District inappropriately sought to exit Addelyn from IDEA eligibility; (2) she continues to require an IEP; and (3) the District did not deny her a FAPE while her previous IEPs were in place.

14.    The Hearing Officer ordered the Family's requested relief in the form of continued eligibility under IDEA and a new IEP which the Parties were ordered to develop in fall 2025.

15.    The Decision granted the Family substantive relief and materially altered the legal relationship between the parties by mandating Addelyn's continued eligibility under IDEA. Thus,

the Family, as the prevailing party, attempted to resolve the issue of attorney's fees and costs with the District.

16. On September 19, 2025, because the District did not offer reasonable attorney's fees and costs to the Family, the Family filed a Complaint to seek an award of statutory attorney's fees and costs, including the time spent litigating the entitlement to attorney's fees. *Addelyn L. v. Downingtown Area Sch. Dist.*, 2:25-cv-05423-JFM, ECF Doc. 1 (the "Fee Complaint").

17. On November 5, 2025, the District filed an Answer with Affirmative Defenses and Counterclaim to the Fee Complaint. *Addelyn L. v. Downingtown Area Sch. Dist.*, 2:25-cv-05423-JFM, ECF Doc. 7 ("Fee Complaint Answer").

18. Although the Family did not file any action to challenge to the Hearing Officer decision below, the District's counterclaim in the Fee Complaint Answer asked this Court to review the Hearing Officer's Decision concerning Addelyn's eligibility for an IEP. *Id.* ("[T]he School District counterclaims in the nature of an appeal from the final administrative decision issued on August 21, 2025 and docketed as ODR No. 31059-24-25 KE, and for a Declaration pursuant to 28 U.S.C. § 2201, seeking review and reversal of the final administrative decision to the extent that the decision and order directed that Addelyn L. remain eligible for special education and related services, and declaration that Addelyn L. is not eligible for special education and related services.")

19. "[A] claim for attorney's fees is not part of the merits of the action to which the fees pertain." *Budinich v. Becton Dickinson & Co*., 486 U.S. 196, 200, 108 S.Ct. 1717, 1721 (1988).

20. Notably, 20 U.S.C. § 1415(i)(2), which provides for court review of a hearing officer's decision, and Section 1415(i)(3), providing for fee shifting, "contain separate jurisdictional

grants, and the weight of authority holds that they create two distinct causes of action." *Santino P. by and through Joseph P. v. Pennsylvania Department of Education*, 2017 WL 2591936, *2 (E.D. Pa. 2017) (Pappert, J.) (internal citations and quotations omitted); *D.G. ex rel. LaNisha T. v. New Caney Independent School Dist.*, 806 F.3d 310, 317 (5th Cir. 2015).

21.    Accordingly, the District was required to file its own civil action to review the Hearing Officer's Decision, because this Court did not have subject matter jurisdiction to consider an appeal of the Hearing Officer's Decision filed pursuant to a counterclaim to the Fee Complaint.

22.    The Family did not originally intend to appeal the merits of the Decision; however, because the District has now raised the issue of Addelyn's eligibility, the Family wishes to appeal the Hearing Officer's denial of compensatory education to Addelyn. The Family also seeks this Court's affirmation of Addelyn's continued eligibility for an IEP. The Family files this as a separate civil action consistent with IDEA's separate grants of jurisdictional authority between actions to review a hearing officer decision and actions to recover prevailing party attorney's fees. 20 U.S.C. § 1415(i)(2)-(3).

## IV.    <u>Jurisdiction and Venue</u>

23.    This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

24.    Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued an administrative Special Education Due Process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

25.    The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202. These statutes provide for declaratory and equitable relief and any further relief that this Court deems necessary and proper.

26.     All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## V.    **Standard of Review**

27.     This Court is required to undertake a fully independent review of the records and the Hearing Officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S. Ct. 3034, 3051 (1982). This review is far broader and more searching than a district court's review of other administrative matters. Judicial review in IDEA cases is called "modified de novo" review because it "differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995).

28.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

29.     In conducting a modified de novo review, district courts give "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id*. at 269-70. Thus, when reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings," unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area School District v. Scott P*., 62 F.3d 520, 529 (3d Cir. 1995). If the Court does not accept these factual findings, it needs to explain why. *Shore Reg'l High Sch. Bd. of Educ. v.*

*P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

30.     The modified de novo review under the IDEA does not apply to Section 504 and ADA claims. *Le Pape v. Lower Merion School District*, 103 F.4th 966, 983 (3d Cir. 2024). Thus, a federal district court applies a de novo standard of review for Section 504 and ADA claims, as opposed to the modified de novo standard of review that the Court will apply for the IDEA claims. *Id*.

## VI.    **Applicable Law**

### A.    **IDEA and Section 504 require that a school district identify and evaluate all children with disabilities who live in the district in all areas of suspected need.**

31.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

32.     The Supreme Court has stated that IDEA, a statute designed to protect children with disabilities, has a "general remedial purpose." *Forest Grove v. T.A.*, 557 U.S. 230, 244, 129 S. Ct. 2484 (2009). It is a "canon of construction that remedial statutes should be liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65, 88 S. Ct. 1549 (1968).

33.     The requirement that school districts properly identify all eligible children is known as Child Find and is mandated under both IDEA and Section 504. 20 U.S.C § 1412(a)(3)(A) and (B); 29 U.S.C.§ 794; 34 C.F.R. §§ 104.33, 300.111. Under these statutes and their regulations, school districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability. *Ridley Sch. Dist. v. M.R.*, 680 F.3d. 260 (3d Cir. 2012).

34.     Under IDEA, the public agency must ensure that a student's "evaluation is

sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304.

      **B.**    **Under IDEA, after the school district identifies a student's needs in an Evaluation Report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

35.    Students with disabilities who fall within the 13 specific categories of educational disabilities and who require special education and related services under IDEA must receive an IEP to address their needs. 20 U.S.C. § 1401(3)(A); *B. S. M. v. Upper Darby Sch. Dist.*, 103 F.4th 956, 963 (3d Cir. 2024).

36.    Section 504, in contrast, "defines disability more broadly than the IDEA, and thus, some students covered by Section 504 are not covered under the IDEA." *B. S. M.*, 103 F. 4th at 963.

37.    The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the district complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Rowley*, *supra*, 458 U.S. at 206-07, 102 S. Ct. at 3051; *Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 403, 137 S. Ct. 988, 999 (2017).

38.    The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires *more* than a program reasonably calculated to allow a student to make "*some* progress." *Endrew F.*, 580 U.S. 397, 402-03, 137 S. Ct. at 997, 1000-01 (emphasis added). Instead,

IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 403.

39.    The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably calculated to allow a student to make *meaningful* educational progress and achieve "significant learning." *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp. 3d 618, 632 (E.D. Pa. 2017) (citing *Endrew F.)*; *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006).

40.    It is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School Dist.*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

41.    A child who is advancing from grade to grade is not automatically receiving a FAPE; rather, a court must specifically apply the standard of FAPE to that child's circumstances. *Endrew F.*, 580 U.S. at 402, n. 2 (citing *Rowley*, 458 U.S. at 203, n. 25).

**C.    Under both IDEA and Section 504, compensatory education is an available remedy for a District's denial of FAPE to a student.**

42.    When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 250 n.11 (3d Cir. 1999); *M.C.*, *supra*, 81 F.3d at 397.

43.    Compensatory education is designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, *supra*, 916 F.2d at 873.

44.    Where a school district's failures deprive the student of the opportunity to benefit from an IEP, then the child find violation results in a substantive violation of IDEA and entitles the student to compensatory education. *Jana K. v. Annville-Cleona Sch. Dist.*, 39 F.Supp.3d 584, 603 (M.D. Pa. 2014).

45.    The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. *M.C.*, 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. *Lester H.*, 916 F.2d at 873.

### D.    Violations of IDEA also violate Section 504, but a school may violate Section 504 independent of any IDEA violations.

46.    Under Section 504, recipients of federal funds are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

47.    Section 504 defines "appropriate education" as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

48.    "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

49.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F. Supp. 2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA).

50.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. Sch. Dist. of Phila.*, 559 F. Supp. 2d 600, 620 (E.D. Pa. 2008).

51.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridgewood*, 172 F.3d at 253.

### E.     Where a school district violates IDEA and Section 504, it also violates the ADA.

52.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). As with IDEA and Section 504, the ADA requires districts to offer all students FAPE without a showing of intent or bad faith as any denial of FAPE violates these federal laws. *Id.*

11

**F.    A parent is entitled to attorney's fees and costs if the parent is the prevailing party.**

53.    The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorney's fees and costs by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

54.    A prevailing party, having obtained substantive relief in the due process proceedings, which altered the legal relationship between the parties, is entitled to an award of statutory attorney's fees and costs, including the time spent litigating the entitlement to attorney's fees. *Planned Parenthood of Central New Jersey v. Attorney General of the State of New Jersey*, 297 F.3d 253, 268 (3d. Cir. 2002); *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res.*, 532 U.S. 598, 604, 121 S. Ct. 1835, 1840 (2001) (even an award of nominal damages suffices for prevailing party status); *Raab v. City of Ocean City, New Jersey*, 833 F.3d 286, 293 (3d Cir. 2016) (same).

**VII.    <u>Factual History</u>**

55.    Plaintiffs incorporate by reference the preceding paragraphs.

**A.    Addelyn's 2021 Reevaluation Report determined that she continued to need Specially Designed Instruction to address her reading comprehension, listening comprehension, and speech or language impairment.**

56.    The District first identified Addelyn as a student with a disability in need of an IEP in May 2018, during third grade, when the District found she had Specific Learning Disabilities in reading comprehension and listening comprehension and a Speech or Language Impairment.

57.    In the sixth grade, the District reevaluated Addelyn. Her Reevaluation Report dated May 14, 2021 ("2021 RR") found she continued to qualify for an IEP because she needed Specially Designed Instruction to address her reading comprehension, listening comprehension, and speech and language impairment.

58.    In the 2021 RR, the District determined that Addelyn has a rare and significant discrepancy between her average cognitive ability and her lower achievement in the areas of reading comprehension and listening comprehension with corresponding academic needs, finding her eligible for an IEP under the primary disability category of Specific Learning Disability in these areas.

59.    The 2021 RR also determined that Addelyn continued to qualify with a secondary disability category of Speech or Language Impairment.

60.    When the District evaluated Addelyn in 2021, the school psychologist conducted two different assessments related to reading comprehension: the Wechsler Individual Achievement Test, Third Edition ("WIAT-III") and the Kaufman Test of Educational Achievement, Third Edition ("KTEA-3").

61.    The WIAT-III resulted in average range reading scores.

62.    However, on the KTEA-3, Addelyn scored in the below average range on reading comprehension, achieving a standard score of 83, which is in the 13th percentile.

63.    On the Children's Memory Scale, Addelyn's general memory score (79) was considered "borderline," at the eighth percentile with scores as low as the first, second, and fifth percentile in the "impaired" and "borderline" range.

64.    The NEPSY-Second Edition also found that she was borderline in "comprehension of instructions."

65.    The results of the speech and language evaluation included in the 2021 RR revealed relative weaknesses in "her listening comprehension, specifically her comprehension of main idea, understanding specific messages, and her auditory memory, specifically her word memory. All of these skills are vital to success in the classroom setting, especially as she progresses into middle

school and high school with more lecture-based learning."

66.    Addelyn was and is an incredibly hardworking student who achieved good grades and scored in the basic to proficient range on state testing despite her disabilities due to her receipt of Specially Designed Instruction.

67.    In the 2021 RR, the District concluded that despite her strong grades, Addelyn continued to require Specially Designed Instruction in an IEP.

**B.    The District failed to provide Addelyn a FAPE from at least the 2022-23 school year (eighth grade) forward.**

68.    In the years following the 2021 RR, the District did not provide the direct instruction that Addelyn required in reading comprehension, listening comprehension, speech and language, and executive functioning and Addelyn did not make progress as a result.

69.    The District denied Addelyn FAPE by failing to provide direct instruction in reading comprehension and a reading comprehension goal which led to regression in her reading comprehension skills demonstrated by her declining scores on the same assessment in 2021 (13th percentile) and 2025 (first percentile).

70.    Addelyn received inadequate special education reading instruction in seventh grade, which failed to teach her the skills to independently comprehend text.

71.    Addelyn informed her parents that the seventh grade reading teacher was giving her answers on her assessments, which was the reason it appeared as if she was doing well in the class.

72.    In eighth grade, the District proposed to have the speech therapist provide pseudo-reading support in her speech therapy sessions, utilizing parts of the Visualizing and Verbalizing program ("V&V").

73.    The speech therapist that provided V&V was not trained in this program and

therefore was not implementing it with fidelity.

74.    The speech therapist providing the reading support was also not a trained reading specialist.

75.    The District agreed that Addelyn has a Specific Learning Disability in reading comprehension, but it failed to provide any goal in this area to measure her progress and failed to provide appropriate Specially Designed Instruction to Addelyn from the 2022-23 school year forward.

76.    The Family did not receive progress monitoring on Addelyn's reading comprehension, so it had no way to know that Addelyn was actually regressing in reading comprehension until January 2025, when Addelyn scored in the first percentile on the reading comprehension test from the KTEA-3.

77.    In 2021, Addelyn scored at the 13th percentile in reading comprehension on the KTEA-3, and she scored in the first percentile in 2025 when the same test was readministered, showing a decline in her reading comprehension abilities.

78.    The Family did not know and should not have known the severity of Addelyn's reading comprehension struggles until the District issued its new reevaluation in January 2025, indicating Addelyn had significantly regressed in reading comprehension.

79.    Addelyn's regression occurred after direct instruction special education reading services were removed from her IEP.

80.    The District also denied Addelyn a FAPE by failing to provide sufficient speech and language related services and accommodations.

81.    Since 2022-23, the only goals in Addelyn's IEPs have been speech and language goals.

82.    Addelyn failed to achieve her speech and language goal in tenth grade, demonstrating her lack of progress.

83.    Additionally, the District denied Addelyn a FAPE by failing to provide direct instruction related to working memory and executive functioning.

84.    Since at least the 2022-23 school year, Addelyn has not received any direct instruction in executive functioning, particularly to address her struggles with working memory.

85.    Starting in eighth grade, she participated in a class called "Organizational Lab," but it did not include any direct instruction.

86.    Organizational Lab did not even include support for reading comprehension and listening comprehension even though Addelyn's IEPs indicated that it would.

87.     Instead, Addelyn used her time in Organizational Lab to complete tests and quizzes, get clarification on assignments, or work on upcoming assignments in a special education classroom monitored by a special education teacher.

88.    The additional time to complete work was helpful to Addelyn, but the District did not provide her with the instruction she needed in executive functioning or working memory whether in Organizational Lab or at other times in her day.

89.    The District failed to monitor or track her progress in executive functioning and working memory.

90.    The District further denied Addelyn a FAPE by failing to provide Organizational Lab from the start of the 2024-25 school year until December 18, 2024.

91.    From the start of the 2024-25 school year until December 18, 2024, the District was only providing Addelyn with one Organizational Lab per cycle, rather than the three classes per cycle to which she was entitled from April 29, 2024, IEP.

92.     The Educational Placement section of the pendent April 29, 2024, IEP provided that Addelyn will participate in an Organizational Lab three periods per six-day cycle.

93.     However, from the start of the school year until December 18, 2024, Addelyn was only permitted to attend one Organizational Lab per cycle.

C.     **Evaluations in 2024 and 2025 showed ongoing or more significant special education needs in reading comprehension, listening comprehension, and executive functioning yet the District incorrectly determined that Addelyn no longer required an IEP.**

94.     In August 2024, just before tenth grade, the District reevaluated Addelyn and issued an August 22, 2024, Reevaluation Report ("2024 RR").

95.     Addelyn's cognitive ability was within the average range (full scale IQ of 97), but she displayed weaknesses in verbal comprehension skills which were in the low average range.

96.     In the 2024 RR, the District again conducted WIAT testing (this time the fourth edition or "WIAT-IV") which again resulted in average reading scores.

97.     The Hearing Officer in his Decision determined that the WIAT reading scores, while average, were still "markedly lower" than the other composites.

98.     The August 2024 RR included an updated speech and language evaluation.

99.     On a language assessment, Addelyn scored below average on the idiomatic language subtest and the lexical/semantic subtest.

100.     On an assessment of semantics and vocabulary, Addelyn scored in the below-average range on the synonyms subtest and in the below-average range on the total test score.

101.     The District determined that Addelyn no longer met the criteria for a Specific Learning Disability in reading comprehension or listening comprehension.

102.     The District determined that Addelyn no longer qualified for an IEP because she did not need Specially Designed Instruction in any area.

103.    The District recommended that Addelyn receive a 504 Service Agreement instead, which does not provide Specially Designed Instruction and only provides accommodations or modifications.

104.    Knowing that Addelyn had in the past required multiple assessments to truly identify whether she had a learning disability, the Family requested that the District evaluate again, this time including additional assessments, including a repeated KTEA-3.

105.    KTEA-3 scores can reliably be compared to show if a student made progress or regressed and can be used to determine the presence of a Specific Learning Disability.

106.    On the new KTEA-3 testing which was administered in December 2024 and shared with the Family in a January 8, 2025, Reevaluation Report ("2025 RR"), Addelyn's reading comprehension score regressed significantly from an 83 in 2021 (13th percentile), to a 66 in 2025 which is in the first percentile.

107.    In 2025, as in 2021, Addelyn had strong grades and scored in the average range on the WIAT; thus, the main difference between the 2021 and 2025 evaluations is Addelyn's regression in reading comprehension on the KTEA.

108.    Whereas the District before determined that Addelyn required special education and related services when she scored in the 13th percentile in 2021, the District, in 2025, incongruously determined that she no longer required special education and related services when she scored even lower.

109.    At the due process hearing, the District's school psychologist was unable to explain why Addelyn qualified in 2021 but did not qualify in 2025.

110.    The District's school psychologist characterized the 2025 KTEA-3 score as an "outlier," but agreed that it is a reliable assessment and that there was no indication that Addelyn did not try her best.

111.    Additionally, in the 2025 RR, Addelyn continued to score in the "borderline" range on the NEPSY Comprehension of Instructions test.

112.    She scored in the "borderline" to "low average" range on the repeated Children's Memory Assessment, including a ninth percentile General Memory score.

113.    Addelyn's testing revealed some persistent deficits in executive functioning even though she was provided with the Specially Designed Instruction in her IEP to support her.

114.    The 2025 RR ignored the full scope of existing data and input provided by the full IEP team, including Parents and Addelyn herself to find that she does not need an IEP.

115.    Teacher input revealed that Addelyn had difficulty with reading comprehension at school.

116.    Ms. Steelman, Addelyn's eighth grade English teacher, found that Addelyn required adult support related to analysis of explicit and implicit meaning from text. She also found that Addelyn "does continue to need some teacher support when analyzing the quote and explaining the quote is relevant."

117.    Ms. Martin, Addelyn's ninth grade history teacher, found Addelyn struggled at times with reading and answering questions. She also found Addelyn to be at-risk for "learning problems" pursuant to the Behavior Assessment System for Children, Third Edition ("BASC-3").

118.    Mr. Visser, Addelyn's tenth grade special education teacher, did not mark "comprehends information" nor "retains information" as strengths.

119. Ms. Ker, Addelyn's tenth grade English teacher, found Addelyn had struggles understanding vocabulary and with providing a deep analysis of a subject.

120. Mr. Bowes, Addelyn's tenth grade history teacher, found that "academically, Addelyn struggles with vocabulary, which limits her reading comprehension," and that she does well "as long as she understands the vocabulary." He also noted that one of Addelyn's academic weaknesses is that she "often needs assistance with vocabulary to understand questions."

121. Addelyn struggled in particular in two classes for which she was recommended in ninth grade: honors history and honors algebra.

122. For ninth grade honors history, Addelyn's family was informed the class was not known to be hard.

123. Nonetheless, the work became too much for Addelyn, and she was forced to remove herself from the class even though her IEP was in place.

124. In the ninth grade honors Algebra class, not only did Addelyn struggle, but she received failing or near failing grades.

125. The last grade she received in the class was a 68% (though that is not reflected on her report card as the transfer from an honors class to a lower-level math class was considered when reporting grades).

126. Her struggles in math specifically highlight her reading comprehension struggles, as one of the main differences between this class and her other math classes was the increase in word problems.

127. Additionally, her eighth grade PSSA scores substantiate struggles in reading. Despite receiving an overall score of "basic" for English Language Arts, she scored "low," the lowest

category, in each reading category. She also scored "low" in the reading/writing category of "text-dependent analysis."

128.    Mr. Floreck, Addelyn's ninth grade science teacher, rated Addelyn using the Behavior Rating Inventory of Executive Functioning: Second Edition ("BRIEF-2"), and his scores resulted in a finding that her working memory was "clinically significant."

129.    Ms. Sandberg, Addelyn's ninth grade English teacher, rated Addelyn using the BRIEF-2, and her scores resulted in a finding that her working memory was "clinically significant."

130.    Additionally, Addelyn's struggles with working memory are demonstrated by her inability to complete assessments without several opportunities for "look-backs" or opportunities to consult the text and find the answers using her "detective" methods.

131.    The executive functioning class, Organizational Lab, has been an effective accommodation for Addelyn, for her test-taking and assignment-planning needs.

132.    Mr. Visser, her tenth grade Organizational Lab teacher, noted that Addelyn "comes up with unique ways to study and prep for assessment."

133.    He said he gives her "a lot of one-on-one attention to help her preview vocab for other classes, and make sure she's keeping up with grades/assignments/upcoming assessments." He also said that she "definitely does utilize and appreciate the support from [Mr. Visser] during Org. Lab."

134.    Addelyn did not master her tenth-grade speech and language goal, yet the District maintains that she does not require continued Speech and Language services.

135.    The District's 2025 reevaluation affirmed that she indeed continues to have a Specific Learning Disability in reading comprehension and listening comprehension along with a

Speech or Language Impairment, backtracking on the 2024 RR's incorrect determination that she did not; however, it found that she does not require Specially Designed Instruction for these disabilities.

136.    Despite teacher, parent, and student input to support that Addelyn required her IEP and despite stagnant or declining scores, the District incorrectly determined in both the 2024 RR and the 2025 RR that Addelyn did not require Specially Designed Instruction and the District proposed to remove Addelyn's IEP.

### D.    The District incorrectly sought to take away Addelyn's IEP even though the Parents and Addelyn herself have voiced that she needs it.

137.    The District's decision to remove Addelyn's IEP is contrary to Addelyn's input and self-advocacy.

138.    The District agreed to provide Addelyn a Section 504 Service Agreement instead of an IEP, but 504 Service Agreements do not include any Specially Designed Instruction and Addelyn would not have access to the Organizational Lab, related services (like speech and language therapy), or direct instruction that she needs to be successful.

139.    The District explained that Addelyn could seek extra help at lunch, but she was already doing that on top of the additional support from her IEP.

140.    Addelyn sought so much extra help (for example, seeking out extra help before and after class and during lunch) and prepared so excessively at home, that she made herself sick with stress and anxiety.

141.    At the hearing, Addelyn's mother explained that Addelyn will "use her resources" like practice tests, Chat GPT, and study guides to help her succeed.

142.    For instance, if she needs to review an article, she "throws that article into ChatGPT, asks for it to be put into a seventh-grade level for her so that" she can understand it, as

"that's the average level she chooses for herself for vocabulary and comprehension" even though it is many years below her grade level.

143.    Addelyn's ability to get A's in her classes does not mean she is actually comprehending the content. *See Endrew F.*, 580 U.S. at 402, n. 2 (citing *Rowley*, 458 U.S. at 203, n. 25).

144.    Addelyn prepared a statement to be read at the IEP meeting, to ensure that the IEP team was aware of her desire to remain eligible for services and her needs.

145.    She advised the IEP team that "when I read I have no clue what happens," and that she "[doesn't] understand written prompts usually because it is based on books and don't pick anything up from books."

146.    She discussed her fears related going to college, and how, without an IEP, she will struggle there.

147.    While Addelyn's guidance counselor, Mr. Findora, read the statement at the IEP meeting, Addelyn got emotional.

148.    After it was read and the District still recommended exiting her from special education, Addelyn broke down and needed to leave the IEP meeting mid-meeting to be consoled by the guidance counselor in his office.

### E.    The Hearing Officer correctly determined that Addelyn requires an IEP.

149.    The Hearing Officer correctly determined that Addelyn still qualifies under Specific Learning Disability in the areas of reading comprehension and listening comprehension as well as Speech and Language Impairment and that she requires Specially Designed Instruction.

150.    The Hearing Officer correctly considered the record as whole to make this determination including the contemporaneous views of the teachers and Addelyn.

151.    The Hearing Officer appropriately resolved the discrepancy between the documentary education and the later testimony of the teachers, relying on the record as a whole to find continued eligibility.

## VIII.    **The Hearing Officer's Errors**

152.    The Plaintiffs incorporate by reference the preceding paragraphs.

153.    Although the Hearing Officer correctly determined that Addelyn requires Specially Designed Instruction in an IEP, the Hearing Officer erred by finding that the District provided FAPE in the earlier school years.

154.    Critically, the Hearing Officer included no analysis on whether the District provided FAPE under Section 504. Thus, a trial de novo must be conducted as to whether the District provided FAPE under Section 504.

155.    The District concedes that Addelyn is an eligible student under Section 504, but the Family raised claims for a denial of FAPE under both IDEA and Section 504 and the Hearing Officer erroneously failed to analyze the Family's Section 504 claims at all.

156.    The Hearing Officer failed to award compensatory education for the clear substantive failure of the District to provide the Organizational Lab to Addelyn as written in her pendent IEP from the start of the 2024-25 school year through December 18, 2024.

157.    The Hearing Officer failed to analyze Addelyn's regression in reading comprehension on the KTEA-3, her lack of direct instruction in reading comprehension, and her lack of a goal and progress monitoring in reading comprehension.

158.    Instead, the Hearing Officer provided in *dicta* that Addelyn requires instruction and a goal, but did not provide any specific rationale for denying the compensatory education for the previous school years in which Addelyn did not have either.

159.     Likewise, the Hearing Officer failed to award compensatory education for Adde-lyn's insufficient speech and language services even though he noted her declining and uneven goal progress.

160.     The Hearing Officer acknowledged that Addelyn's testing showed needs in memory, but failed to award any compensatory education for the District's failure to provide direct instruction to address her executive functioning and working memory needs.

161.     The Hearing Officer summarily stated that the IEPs were reasonably calculated to yield meaningful educational benefit without any record citations or analysis. Later, he determined that the record established "an overall sense of progress" but failed to cite any documentary or testimonial evidence to support this and failed to use the appropriate standard of meaningful educational progress.

## IX.     <u>Additional Evidence That Should Be Considered By This Court</u>

162.     This Court should hear additional evidence as requested by a party pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii) in the form of Addelyn's updated IEP and progress from the 2025-26 school year, which reinforces her ongoing need for Specially Designed Instruction and the denial of FAPE from the previous school years.

163.     Addelyn is entitled to a trial de novo on her Section 504 FAPE claims which were raised in the administrative Due Process Complaint but which the Hearing Officer failed to address in the Decision. *Le Pape v. Lower Merion School District*, 103 F.4th 966, 983 (3d Cir. 2024).

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.     Assume jurisdiction over this action;

2.     Hear additional evidence as requested by a party pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii) and conduct a de novo review under Section 504 including, as applicable, live

evidence on these claims;

3.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA, and Pennsylvania law;

4.    Affirm the Hearing Officer's Decision that Addelyn is eligible for special education and related services under IDEA;

5.    Reverse the Hearing Officer's Decision that the Family is not entitled to compensatory education and award the Family compensatory education for the District's violations beginning in March 28, 2023 for the denial of FAPE under IDEA, Section 504, and the ADA;

6.    Order the Defendant to pay Plaintiffs' reasonable attorneys' fees and related costs as the prevailing party below; and

7.    Grant such other relief as this Court deems proper.

Respectfully submitted,

/s/ Jacqueline C. Lembeck
Jacqueline C. Lembeck, Esquire
PA ID No. 314535
jlembeck@mcandrewslaw.com

/s/ Michael J. Connolly
Michael J. Connolly, Esquire
PA ID No. 82065
MConnolly@mcandrewslaw.com

/s/ Rachel Rosenberg
Rachel Rosenberg, Esquire
PA ID No. 322960
RRosenberg@mcandrewslaw.com
McANDREWS,    MEHALICK,    CONNOLLY,
HULSE and RYAN, P.C
30 Cassatt Avenue, Berwyn, PA 19312
O: (610) 648-9300
Attorneys for Plaintiffs